IN THE SUPREME COURT OF NORTH CAROLINA

No. 366PA13

FILED 6 NOVEMBER 2015

STATE OF NORTH CAROLINA

v.

LESTER GERARD PACKINGHAM

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, ___ N.C. App. ___, 748 S.E.2d 146 (2013), vacating a judgment entered on 30 May 2012 by Judge William Osmond Smith in Superior Court, Durham County. Heard in the Supreme Court on 8 September 2014.

*Roy Cooper, Attorney General, by Anne M. Middleton and David L. Elliott, Assistant Attorneys General, for the State-appellant.*

*Glenn Gerding, Appellate Defender,[1] for defendant-appellee.*

EDMUNDS, Justice.

The Court of Appeals vacated defendant's conviction for accessing a social networking Web site as a registered sex offender, finding that the applicable statute, N.C.G.S. § 14-202.5, is unconstitutional both on its face and as applied to defendant. We conclude that the statute is constitutional in all respects. Accordingly, we reverse the holding to the contrary of the Court of Appeals.

---

[1] Glenn Gerding was appointed to the position of Appellate Defender on 1 November 2015. His motion to withdraw as private assigned counsel was allowed by this Court on 5 November 2015. His motion to represent defendant through this Court's appointment of the Appellate Defender was also allowed on 5 November 2015.

In 2008, the General Assembly enacted N.C.G.S. § 14-202.5, which bans the use of commercial social networking Web sites by registered sex offenders. In April 2010, Officer Brian Schnee of the Durham Police Department began an investigation to detect such sex offenders living in Durham who were illegally accessing commercial social networking Web sites. Officer Schnee identified defendant Lester Gerard Packingham (defendant), who had been convicted in 2002 of a sexual offense in Cabarrus County, North Carolina, as a registered sex offender subject to N.C.G.S. § 14-202.5. Officer Schnee located defendant's name and photograph on the North Carolina Department of Justice Sex Offender Registry. While investigating the Web site Facebook.com, Officer Schnee found a user profile page that, based upon the profile photo, he believed belonged to defendant. Although the name on the Facebook account was "J.R. Gerrard," Officer Schnee was able to confirm that the Facebook page in fact was defendant's. During a subsequent search of defendant's residence, officers recovered a notice of "Changes to North Carolina Sex Offender Registration Laws" signed by defendant describing commercial social networking Web sites that he was prohibited from accessing. This document was admitted into evidence at trial.

On 20 September 2010, defendant was indicted by a Durham County grand jury for violating N.C.G.S. § 14-202.5. On 9 December 2010, defendant filed a motion to dismiss the charge in Superior Court, Durham County, contending that section 14-202.5 is unconstitutional on its face or as applied to him. On 19 April 2011, the trial court entered an order denying defendant's motion. The trial court's order included

a finding of fact that both the State and defendant agreed that Facebook.com is a social networking Web site as contemplated by N.C.G.S. § 14-202.5. The trial court declined to address defendant's facial challenge but found that N.C.G.S. § 14-202.5 was constitutional as applied to defendant. On 22 June 2011, the Court of Appeals denied defendant's petition for certiorari.

The case went to trial and, after considering evidence that defendant maintained a Facebook page, a jury on 30 May 2012 found defendant guilty of one count of accessing a commercial social networking Web site by a registered sex offender. The trial court sentenced defendant to a term of six to eight months of imprisonment, suspended for twelve months, and defendant was placed on supervised probation.

Defendant appealed to the Court of Appeals, challenging the constitutionality of N.C.G.S. § 14-202.5. That court determined that N.C.G.S. § 14-202.5 "plainly involves defendant's First Amendment rights . . . because it bans the freedom of speech and association via social media" and concluded that intermediate scrutiny was appropriate. *State v. Packingham*, ___ N.C. App. ___, ___, 748 S.E.2d 146, 150 (2013). While acknowledging the legitimate state interest in protecting children from sex offenders, the Court of Appeals found that the statute "is not narrowly tailored, is vague, and fails to target the 'evil' it is intended to rectify" because it "arbitrarily burdens all registered sex offenders by preventing a wide range of communication and expressive activity unrelated to achieving its purported goal." *Id.* at ___, 748

S.E.2d at 154. The court further concluded that the language of N.C.G.S. § 14-202.5 "lacks clarity, is vague, and certainly fails to give people of ordinary intelligence fair notice of what is prohibited." *Id.* at ___, 748 S.E.2d at 153. Accordingly, finding that the statute violates the First Amendment, the Court of Appeals held the statute unconstitutional on its face and as applied, and vacated defendant's conviction. *Id.* at ___, 748 S.E.2d at 154. On 7 November 2013, this Court allowed the State's Petition for Discretionary Review.

Statutes are presumed constitutional, *Wayne Cty. Citizens Ass'n for Better Tax Control v. Wayne Cty. Bd. of Comm'rs*, 328 N.C. 24, 29, 399 S.E.2d 311, 314-15 (1991), and the interpretation of a statute is controlled by the intent of the legislature, *State v. Hart*, 287 N.C. 76, 80, 213 S.E.2d 291, 294-95 (1975). We review challenges to the constitutionality of a statute de novo. *In re Adoption of S.D.W.*, 367 N.C. 386, 391, 758 S.E.2d 374, 378 (2014) (citing *Libertarian Party of N.C. v. State*, 365 N.C. 41, 46, 707 S.E.2d 199, 202-03 (2011)).

Defendant argues that N.C.G.S. § 14-202.5 is unconstitutional both on its face and as applied to him, contending that the statute violates his right to free speech as guaranteed by the United States and North Carolina Constitutions. U.S. Const. amend. I ("Congress shall make no law . . . abridging the freedom of speech . . . ."); N.C. Const. art. I, § 14 ("Freedom of speech and of the press are two of the great bulwarks of liberty and therefore shall never be restrained . . . ."). As we begin our analysis, we note that while these constitutional provisions appear absolute,

"[h]istory, necessity, and judicial precedent have proven otherwise: 'Freedom of speech is not an unlimited, unqualified right.' " *Hest Techs., Inc. v. State ex rel. Perdue*, 366 N.C. 289, 297, 749 S.E.2d 429, 435 (2012) (quoting *State v. Leigh*, 278 N.C. 243, 250, 179 S.E.2d 708, 712 (1971)), *cert. denied*, ___ U.S. ___, 134 S. Ct. 99, 187 L. Ed. 2d 34 (2013). In addition, when analyzing alleged violations of our State Constitution's Free Speech Clause, this Court has given great weight to the First Amendment jurisprudence of the United States Supreme Court. *See State v. Petersilie*, 334 N.C. 169, 184, 432 S.E.2d 832, 841 (1993) (adopting that Court's First Amendment jurisprudence "[i]n this case").

The issue before us is whether the proscription of access to some social networking Web sites violates the First Amendment. An as-applied challenge contests whether the statute can be constitutionally applied to a particular defendant, even if the statute is otherwise generally enforceable. *Frye v. City of Kannapolis*, 109 F. Supp. 2d 436, 439 (M.D.N.C. 1999). A facial challenge maintains that no constitutional applications of the statute exist, prohibiting its enforcement in any context. *Id.* The constitutional standards used to decide either challenge are the same. *Edwards v. District of Columbia*, 755 F.3d 996, 1001 (D.C. Cir. 2014).

We begin by considering defendant's facial challenge, cognizant that a facial attack on a statute imposes a demanding burden on the challenger. *United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 2100, 95 L. Ed. 2d 697, 707 (1987). This Court rarely upholds facial challenges because "[t]he fact that a statute 'might

operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid.' " *State v. Thompson*, 349 N.C. 483, 491, 508 S.E.2d 277, 282 (1998) (quoting *Salerno*, 481 U.S. at 745, 107 S. Ct. at 2100, 95 L. Ed. 2d at 707).

The First Amendment is triggered by regulations that burden speech, so we must make an initial determination whether N.C.G.S. § 14-202.5 is a regulation of speech or a regulation of conduct. The distinction is critical because a statute that regulates speech is "subjected to exacting scrutiny: The State must show that the 'regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.' " *Burson v. Freeman*, 504 U.S. 191, 198, 112 S. Ct. 1846, 1851, 119 L. Ed. 2d 5, 14 (1992) (plurality) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S. Ct. 948, 955, 74 L. Ed. 2d 794, 804 (1983)). First Amendment protection of speech is extended to conduct only when the conduct in question "is inherently expressive." *Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 66, 126 S. Ct. 1297, 1310, 164 L. Ed. 2d 156, 175 (2006). In contrast, a regulation that governs conduct while imposing only an incidental burden upon speech "must be evaluated in terms of [its] general effect." *United States v. Albertini*, 472 U.S. 675, 689, 105 S. Ct. 2897, 2906, 86 L. Ed. 2d 536, 548 (1985). An incidental burden on speech is permissible "so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id*.

The statute at issue provides in pertinent part:

(a) **Offense.** — It is unlawful for a sex offender who is registered in accordance with Article 27A of Chapter 14 of the General Statutes to access a commercial social networking Web site where the sex offender knows that the site permits minor children to become members or to create or maintain personal Web pages on the commercial social networking Web site.

(b) For the purposes of this section, a "commercial social networking Web site" is an Internet Web site that meets all of the following requirements:

(1)  Is operated by a person who derives revenue from membership fees, advertising, or other sources related to the operation of the Web site.

(2)  Facilitates the social introduction between two or more persons for the purposes of friendship, meeting other persons, or information exchanges.

(3)  Allows users to create Web pages or personal profiles that contain information such as the name or nickname of the user, photographs placed on the personal Web page by the user, other personal information about the user, and links to other personal Web pages on the commercial social networking Web site of friends or associates of the user that may be accessed by other users or visitors to the Web site.

(4)  Provides users or visitors to the commercial social networking Web site mechanisms to communicate with other users, such as a message board, chat room, electronic mail, or instant messenger.

(c) A commercial social networking Web site does not include an Internet Web site that either:

(1)  Provides only one of the following discrete services: photo-sharing, electronic mail, instant messenger, or chat room or message board platform; or

(2)  Has as its primary purpose the facilitation of commercial transactions involving goods or services between its members or visitors.

N.C.G.S. § 14-202.5 (2013).

This statute addresses the ability of registered sex offenders to access some social networking Web sites. We concluded in *Hest* that legislation banning the operation of sweepstake systems primarily regulated "noncommunicative conduct rather than protected speech." 366 N.C. at 296, 749 S.E.2d at 435. The plaintiff in *Hest* argued that video games which were used to announce the results of the sweepstakes should be protected by the First Amendment. We disagreed, finding that the statute at issue in that case prohibited not the video games but the underlying conduct of a sweepstakes whose outcome was announced through the video game. *Id.* at 297, 749 S.E.2d at 435. Unlike the statute in *Hest*, however, the statute here defines a "commercial social networking Web site" as one that facilitates social introduction between people, N.C.G.S. § 14-202.5(b)(2), and provides users with a means of communicating with each other, *id.* § 14-202.5(b)(4). As is apparent to any who access them, social networking Web sites provide both a forum for gathering information and a means of communication. Even so, like the statute in *Hest*, the essential purpose of section 14-202.5 is to limit conduct, specifically the ability of registered sex offenders to access certain carefully-defined Web sites. This limitation on conduct only incidentally burdens the ability of registered sex offenders to engage in speech after accessing those Web sites that fall within the statute's reach. Thus we conclude that section 14-202.5 is a regulation of conduct.

Our next inquiry is whether N.C.G.S. § 14-202.5 governs conduct on the basis

of the content of speech or is instead a content-neutral regulation. *See Brown v. Town of Cary*, 706 F.3d 294, 300 (4th Cir. 2013) ("Our first task is to determine whether the [statute] 'is content based or content neutral . . . .' ") (quoting *City of Ladue v. Gilleo*, 512 U.S. 43, 59, 114 S. Ct. 2038, 2047, 129 L. Ed. 2d 36, 50 (1994) (O'Connor, J., concurring)). The level of scrutiny we apply is based on this determination. Restrictions based upon the content of the speech trigger strict scrutiny, *see United States v. Playboy Entm't Grp.*, 529 U.S. 803, 814, 120 S. Ct. 1878, 1886, 146 L. Ed. 2d 865, 880 (2000), and are "presumptively invalid," *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382, 112 S. Ct. 2538, 2542, 120 L. Ed. 2d 305, 317 (1992) (citations omitted). To survive under strict scrutiny, the regulation "must be the least restrictive means of achieving a compelling state interest." *McCullen v. Coakley*, ___ U.S. ___, ___, 134 S. Ct. 2518, 2530, 189 L. Ed. 2d 502, 515 (2014) (citation omitted). In contrast, content-neutral regulations of conduct that impose an incidental burden on speech are subject to intermediate scrutiny because they "pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642, 114 S. Ct. 2445, 2459, 129 L. Ed. 2d 497, 517 (1994).

The United States Supreme Court recently discussed the distinction between content-based and content-neutral regulations in *Reed v. Town of Gilbert*, ___ U.S. ___, 135 S. Ct. 2218, 192 L. Ed. 2d 236 (2015). Under *Reed*, a court initially must consider "whether the law is content neutral on its face." *Id.* at ___, 135 S. Ct. at 2228, 192 L. Ed. 2d at 246. Although *Reed* focused on the interpretation of content-

based regulations of *speech*, while we concluded above that section 14-202.5 is a regulation of *conduct*, even under a *Reed* analysis we see that section 14-202.5 is a content-neutral regulation. On its face, this statute imposes a ban on accessing certain defined commercial social networking Web sites without regard to any content or message conveyed on those sites. The limitations imposed by the statute are based not upon speech contained in or posted on a site, but instead focus on whether functions of a particular Web site are available for use by minors. Thus, we conclude, as the Court did in *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S. Ct. 2746, 2754, 105 L. Ed. 2d 661, 675 (1989), that section 14-202.5 "involve[s] a facially content-*neutral* ban on the use [of commercial social networking Web sites]." *Reed*, ___ U.S. at ___, 135 S. Ct. at 2228, 192 L. Ed. 2d at 247 (citing *Ward*, 491 U.S. at 792, 109 S. Ct. at 2754, 105 L. Ed. 2d at 676).

As to the intent of the General Assembly in passing section 14-202.5, the trial court found as a matter of law that the purpose of the statute is to "facilitate the legitimate and important aim of the protection of minors from sex offenders who are registered in accordance with Chapter 14, Article 27A of the General Statutes." The parties have not challenged this conclusion of law. *Reed* states that a law, though content neutral on its face, is "considered [a] content-based regulation[] of speech" if the law "cannot be 'justified without reference to the content of the regulated speech' or [was] adopted by the government 'because of disagreement with the message [the speech] conveys.' " *Id.* at ___, 135 S. Ct. at 2227, 192 L. Ed. 2d at 245 (fourth

alteration in original) (quoting *Ward,* 491 U.S. at 791, 109 S. Ct. at 2754, 105 L. Ed. 2d at 675). A court must address both prongs before concluding that a lower level of scrutiny applies to the law. *Id.* at ___, 135 S. Ct. at 2228, 192 L. Ed. 2d at 247. Assuming that these tests also apply to a regulation of conduct, we see that section 14-202.5 satisfies both. The justification of the statute—protecting minors from registered sex offenders—is unrelated to any speech on a regulated site. Nor does the statute have anything to say regarding the content of any speech on a regulated site. As a result, we conclude that, to the extent *Reed* applies to our analysis of section 14-202.5, the statute satisfies that case's requirements and strict scrutiny is not required. Although the statute may impose an incidental burden on the ability of registered sex offenders to engage in speech on the Internet, "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791, 109 S. Ct. at 2754, 105 L. Ed. 2d at 675 (citation omitted). Accordingly, we conclude that N.C.G.S. § 14-202.5 is a content-neutral regulation requiring intermediate scrutiny.

"Articulations of intermediate scrutiny vary depending on context, but tend to require an important or substantial government interest, a direct relationship between the regulation and the interest, and regulation no more restrictive than necessary to achieve that interest." *Hest*, 366 N.C. at 298, 749 S.E.2d at 436 (citation omitted). The Supreme Court has provided guidance in applying intermediate

scrutiny. In *United States v. O'Brien*, the defendant claimed that the statute

forbidding destruction of his Selective Service registration card was unconstitutional

as applied to him because such a ban on burning the card violated his right to free

speech. 391 U.S. 367, 88 S. Ct. 1673, 20 L. Ed. 2d 672 (1968). The Supreme Court

found that "when 'speech' and 'nonspeech' elements are combined in the same course

of conduct," *id.* at 376, 88 S. Ct. at 1678, 20 L. Ed. 2d at 679, the regulation

> is sufficiently justified [1] if it is within the constitutional power of the Government; [2] if it furthers an important or substantial governmental interest; [3] if the governmental interest is unrelated to the suppression of free expression; and [4] if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest,

*id.* at 377, 88 S. Ct. at 1679, 20 L. Ed. 2d at 680. Because the statute at issue here is

a content-neutral regulation that imposes only an incidental burden on speech, we

believe the four-factor test from *O'Brien* is instructive in evaluating defendant's facial

attack on N.C.G.S. § 14-202.5.

Looking to the first two *O'Brien* factors, the parties agree that promulgating

restrictions such as those contained in N.C.G.S. § 14-202.5 on registered sex offenders

is within the constitutional power of the General Assembly and that protecting

children from sexual abuse is a substantial governmental interest. We then consider

*O'Brien*'s third factor, whether this governmental interest is related to the

suppression of free expression. The State asserts that the statute was enacted to

prevent registered sex offenders from prowling on social media and gathering

information about potential child targets. Viewing this statute as a preventive measure apparently intended to forestall illicit lurking and contact, we see that it is distinguishable from other North Carolina statutes that criminalize communications which have already occurred. The interest reflected in the statute at bar, which protects children from convicted sex offenders who could harvest information to facilitate contact with potential victims, is unrelated to the suppression of free speech. Accordingly, the statute satisfies *O'Brien*'s third factor.

Although the fourth *O'Brien* factor appears to reflect the strict scrutiny requirement that the regulation be the "least restrictive means" of carrying out a compelling state interest, *McCullen*, ___ U.S. at ___, 134 S. Ct. at 2530, 189 L. Ed. 2d at 515, the United States Supreme Court has since explained that for content-neutral regulations, the statute should be "narrowly tailored to serve a significant governmental interest," *Ward*, 491 U.S. at 796, 109 S. Ct. at 2756, 105 L. Ed. 2d at 678 (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293, 104 S. Ct. 3065, 3069, 82 L. Ed. 2d 221, 227 (1984)) (finding that a narrowly tailored regulation controlling noise does not restrict free speech). Narrow tailoring requires the government to demonstrate that "alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen*, ___ U.S. at ___, 134 S. Ct. at 2540, 189 L. Ed. 2d at 526.

Defendant argues that the statute is not narrowly tailored. Specifically, defendant contends that the statute's definition of a "commercial social networking Web site" is overbroad, that the statute does not take into account the underlying offense of conviction or the likelihood of recidivism, that the statute does not require criminal intent, that the statute is underinclusive because, *inter alia*, it applies only to commercial Web sites, that less burdensome laws already exist to protect children from baleful Internet contacts, and that sufficient alternatives allowing communication do not exist. Defendant's arguments are premised on the assumption that a statute regulating the manner of speech must be drawn as narrowly as possible, or at least more narrowly than this statute. However, the Supreme Court has stated explicitly that "[l]est any confusion on the point remain, we reaffirm today that a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so." *Ward*, 491 U.S. at 798, 109 S. Ct. at 2757-58, 105 L. Ed. 2d at 680. The Court went on to explain that "[s]o long as the means chosen are not substantially broader than necessary to achieve the government's interest, however, the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Id.* at 800, 109 S. Ct. at 2758, 105 L. Ed. 2d at 681.

Instead of imposing a blanket prohibition against Internet use, the statute establishes four specific criteria that must be met in order for a commercial social networking Web site to be prohibited. N.C.G.S. § 14-202.5(b). In addition, the statute entirely exempts Web sites that are exclusively devoted to speech, such as instant messaging services and chat rooms. *Id.* § 14-202.5(c). Thus we see that the General Assembly has carefully tailored the statute in such a way as to prohibit registered sex offenders from accessing only those Web sites that allow them the opportunity to gather information about minors, thereby addressing the evil that the statute seeks to prevent. While we acknowledge that defendant has identified some areas in which the statute could have been drafted even more narrowly, we conclude that the statute is sufficiently narrowly drawn to satisfy the requirements of *Ward*.

Our inquiry does not end here, however. A content-neutral statute not only must be narrowly tailored but must also "leave open ample alternative channels for communication." *Ward*, 491 U.S. at 791, 109 S. Ct. at 2753, 105 L. Ed. 2d at 675 (quoting *Cmty. for Creative Non-Violence*, 468 U.S. at 293, 104 S. Ct. at 3069, 82 L. Ed. 2d at 227). Subsection 14-202.5(c) allows such alternatives through specific exceptions for Web sites that provide discrete e-mail, chat room, photo-sharing, and instant messaging services. A Web site that requires one seeking access to provide no more than a username and an email address to reach the page does not necessarily violate the statute. Only a site that generates or creates a Web page or a personal profile for the user and otherwise meets the requirements of the statute is prohibited.

In addition, even if a site falls within the definition of a "commercial social networking Web site" found in subsection 14-202.5(b), in order to convict a registered sex offender of accessing the site, the State must prove that "the sex offender knows that the site permits minor children to become members or to create or maintain personal Web pages on the commercial social networking Web site." N.C.G.S. § 14-202.5(a).

In his brief and argument to this Court, defendant lists numerous well-known Web sites that he contends he could not access legally. In considering those and other similar sites, we find that even where defendant is correct, the Web offers numerous alternatives that provide the same or similar services that defendant could access without violating N.C.G.S. § 14-202.5. For example, defendant would not violate N.C.G.S. § 14-202.5 by accessing the Paula Deen Network, a commercial social networking Web site that allows registered users to swap recipes and discuss cooking techniques, because its Terms of Service require users to be at least eighteen years old to maintain a profile. *Paula Deen Network Terms of Service*, http://www.pauladeen.com/terms-of-service/ (last visited 5 November 2015) ("This website is designed for and targeted to Adults. It is intended solely and exclusively for those at least 18 years of age or older."). Similarly, users may follow current events on WRAL.com, which requires users to be at least eighteen years old to register with the site and, as a result, is not prohibited. *Capitol Broadcasting Company Terms of Use*, http://www.capitolbroadcasting.com/terms-of-use/ (last visited 5 November 2015) ("[Y]ou must be at least 18 years old to register and to use

the Services."). A sex offender engaging in an on-line job search is free to use the commercial social networking Web site Glassdoor.com, which prohibits use by individuals under the age of eighteen. *Glassdoor Terms of Use*, http://www.glassdoor.com/about/terms.htm (last visited 5 November 2015) ("To access or use Glassdoor, you must be 18 years of age or older . . . ."). Finally, sex offenders permissibly may access Shutterfly to share photos, because that site limits its users to those eighteen and older. *Shutterfly Terms of Use*, http://shutterfly-inc.com/terms.html (last visited 5 November 2015) ("In order to create a member account with any of our Sites and Apps, you must be at least 18 years of age.").

While we leave for another day the question whether a site's terms of use alone are sufficient as a matter of law to impute knowledge of the site's limitations on access to a registrant, such terms of use provide specific and pertinent information to a registered sex offender seeking lawful access to the Internet. These examples demonstrate that the Web offers registered sex offenders myriad sites that do not run afoul of the statute. In addition, such methods of communication as text messages, FaceTime, electronic mail, traditional mail, and phone calls, which are not based on use of a Web site, are unrestricted. Accordingly, the regulation leaves open ample channels of communication that registered sex offenders may freely access.

Defendant cites cases from other jurisdictions faulting similar statutes. However, those cases are not binding on this Court, and the statutes under consideration in those cases are readily distinguishable from our own. For instance,

a federal circuit court found unconstitutional an Indiana statute that sought to prevent most sex offenders from communicating with minors by prohibiting their use of commercial social networking Web sites, including instant messaging services and chat rooms. *See Doe v. Prosecutor, Marion Cty.*, 705 F.3d 694, 695-96 (7th Cir. 2013). The circuit court found that the law was not narrowly tailored to prevent illicit communications between sex offenders and minors. *Id.* at 695. Not only did the Indiana statute prohibit use of instant messaging and chat room services, both of which are exempted under N.C.G.S. § 14-202.5, Indiana's statute focused on preventing communications, while North Carolina's statute focuses on preventing registered sex offenders from gathering information about minors on the Internet. Similarly, while a federal court concluded that Louisiana's statute, which was analogous to Indiana's, was facially unconstitutional because it was vague and overbroad, *Doe v. Jindal*, 853 F. Supp. 2d 596, 607 (M.D. La. 2012), Louisiana thereafter amended that statute to a version more in line with N.C.G.S. § 14-202.5, *see* La. Rev. Stat. Ann. 14:91.5 (2012), *available at* http://legis.la.gov/Legis/Law.aspx?d=78714.

Thus, we conclude that N.C.G.S. § 14-202.5 satisfies *O'Brien*'s four factors, is narrowly tailored to serve a substantial governmental interest, and leaves available ample alternative channels of communication. Defendant has failed to meet the high bar necessary to mount a successful facial challenge. *See, e.g.*, *Thompson*, 349 N.C. at 496, 508 S.E.2d at 285 (holding defendant's facial challenge to a statute regulating

pretrial release failed when defendant did not establish that no set of circumstances existed under which the act would not be valid). Accordingly, we conclude the statute is constitutional on its face.

We next consider defendant's as-applied challenge. A statute that is constitutional on its face nevertheless may be unconstitutional as applied to a particular defendant. Because Facebook does not limit users to those over the age of eighteen and otherwise fits the definition of a commercial social networking Web site set out in N.C.G.S. § 14-202.5, defendant is forbidden to access that site unless the statute is unconstitutional as applied to him. Earlier in this opinion we observed that the trial court made the uncontested finding that the government's interest here is protecting minors by preventing registered sex offenders from gathering information about them on social media. Although we also found that the statute is content-neutral, we observed that it imposes an incidental burden on speech on the Internet. We now consider whether this incidental restriction on defendant is no greater than is essential to further the government's interest. *O'Brien*, 391 U.S. at 377, 88 S. Ct. at 1679, 20 L. Ed. 2d at 680.

Beginning with consideration of the nature and severity of the incidental restriction, we have stated that "[i]t is possible to find some kernel of expression in almost every activity a person undertakes." *Hest*, 366 N.C. at 298, 749 S.E.2d at 436 (quoting *City of Dallas v. Stanglin*, 490 U.S. 19, 25, 109 S. Ct. 1591, 1595, 104 L. Ed. 2d 18, 25 (1989)). The United States Fourth Circuit Court of Appeals has held that,

in the context of responding to a posting on a political campaign page maintained on Facebook.com, simply "liking" the post is speech protected by the First Amendment, an analysis with which we agree. *See Bland v. Roberts*, 730 F.3d 368, 386 (4th Cir. 2013) ("[C]licking on the 'like' button literally causes to be published the statement that the User 'likes' something, which is itself a substantive statement."). Here, defendant posted the following on Facebook: "Man God is Good! How about I got so much favor they dismissed the ticket before court even started? . . . Praise be to GOD, WOW! Thanks JESUS!" If merely "liking" a post on Facebook.com is speech protected by the First Amendment, we have no doubt that posting a message on that site falls within this category as well. Thus, the statutory restrictions on defendant's right to speech on Facebook, while incidental, are not trivial.

Considering next the governmental interest in protecting minors, when "a direct relationship between the regulation and the interest" exists, *Hest*, 366 N.C. at 298, 749 S.E.2d at 436, an incidental burden on speech can be justified if the governmental interest is being furthered, *see Turner Broad. Sys.*, 512 U.S. at 662, 114 S. Ct. at 2469, 129 L. Ed. 2d at 530. Nevertheless, "[w]hen the Government defends a regulation on speech as a means to . . . prevent anticipated harms, it must do more than simply 'posit the existence of the disease sought to be cured.'" *Id.* at 664, 114 S. Ct. at 2470, 129 L. Ed. 2d at 531 (quoting *Quincy Cable TV, Inc. v. FCC*, 768 F.2d 1434, 1455 (D.C. Cir. 1995)). Instead, the State must demonstrate "that the regulation will in fact alleviate these harms in a direct and material way." *Id.*

(citations omitted). The State argues that protection of minors from known sexual predators is a vital duty, one this Court has recognized in another context. *See Standley v. Town of Woodfin*, 362 N.C. 328, 333, 661 S.E.2d 728, 731 (2008) (discussing the risk of recidivism among sex offenders).

In considering this balance between the governmental interest and the incidental burden on this defendant's speech, we are mindful of our opinion in *Britt v. State*, in which we were confronted with a challenge to the constitutionality of N.C.G.S. § 14-415.1, which banned all convicted felons from possessing firearms. 363 N.C. 546, 681 S.E.2d 320 (2009). We held that the statute violated the North Carolina Constitution when applied to the plaintiff because his underlying offense (a nonviolent drug crime), his subsequent lawful behavior and demonstrated respect for the law, and his history of peaceable conduct following his conviction, all gave no indication that he posed any substantial threat to society. *Id.* at 550, 681 S.E.2d at 323. As a result, we concluded that the statute barring the plaintiff from possessing a firearm was "not fairly related" to the governmental purpose for which the statute was enacted, which was "the preservation of public peace and safety." *Id.* The statute was unconstitutional as applied to the plaintiff when prosecution would not further that governmental interest.

As indicated by our analysis in *Britt*, the determination whether a statute is unconstitutional as applied is strongly influenced by the facts in a particular case. In ascertaining whether the government's interest in protecting children from

registered sex offenders who are lurking on social networking Web sites and gleaning information on potential targets is furthered by prosecution of this defendant, we observe that defendant has the status of a registered sex offender because he was convicted of indecent liberties with a minor, a sex crime against a child falling directly within the purview of section 14-202.5. Officers who searched his home found a signed written notice advising defendant of sites he could not legally access. Defendant set up his Facebook page under an alias, further indicating his awareness that he was indulging in forbidden behavior while simultaneously hiding his identity from investigators and parents. Thus defendant's case is readily distinguishable from *Britt*, in which the plaintiff's underlying conviction for drugs was considerably less directly related to the possession of "sporting rifles and shotguns" than is defendant's indecent liberties conviction to his use of Internet sites frequented by minors. Moreover, the plaintiff in *Britt* discussed the law's application to him with his local sheriff and thereafter voluntarily divested himself of all firearms before instituting his constitutional challenge to the statute, while defendant here deliberately disguised his identity. *Id.* at 547-48, 681 S.E.2d at 321-22. Unlike the plaintiff in *Britt*, defendant neither demonstrated respect for the law nor made good faith efforts to comply with the statute. These facts satisfy us that the incidental burden imposed upon this defendant, who is barred from Facebook.com but not from many other sites, is not greater than necessary to further the governmental interest of protecting children from registered sex offenders. Thus, N.C.G.S. § 14-202.5 is not an

unreasonable regulation and is constitutional as applied to defendant. *Cf. id.* at 550, 681 S.E.2d at 323.

Defendant also argues that N.C.G.S. § 14-202.5 is unconstitutionally overbroad. "In the First Amendment context, . . . this Court recognizes 'a second type of facial challenge,' whereby a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.' " *United States v. Stevens*, 559 U.S. 460, 473, 130 S. Ct. 1577, 1587, 176 L. Ed. 2d 435, 447 (2010) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6, 128 S. Ct. 1184, 1190 n.6, 170 L. Ed. 2d 151, 160 n.6 (2008)). In *Broadrick v. Oklahoma*, the Court clarified the limited scope of the overbreadth doctrine, explaining that

> the plain import of our cases is, at the very least, that facial overbreadth adjudication is an exception to our traditional rules of practice and that its function, a limited one at the outset, attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from "pure speech" toward conduct and that conduct—even if expressive—falls within the scope of otherwise valid criminal laws that reflect legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct. Although such laws, if too broadly worded, may deter protected speech to some unknown extent, there comes a point where that effect—at best a prediction—cannot, with confidence, justify invalidating a statute on its face and so prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe.

413 U.S. 601, 615, 93 S. Ct. 2908, 2917-18, 37 L. Ed. 2d 830, 842 (1973). Because the

notion of striking a statute at the request of one to whom it otherwise unquestionably applies goes against the grain of "prudential limitations on constitutional adjudication," *New York v. Ferber*, 458 U.S. 747, 767, 102 S. Ct. 3348, 3360, 73 L. Ed. 2d 1113, 1130 (1982), the Supreme Court of the United States has recognized that the doctrine is "strong medicine" to be administered only with caution and as a "last resort," *id.* at 769, 102 S. Ct. at 3361, 73 L. Ed. 2d at 1130 (quoting *Broadrick*, 413 U.S. at 613, 93 S. Ct. at 2916, 37 L. Ed. 2d at 814). A party raising such a challenge "bears the burden of demonstrating, 'from the text of [the law] and from actual fact,' that substantial overbreadth exists." *Virginia v. Hicks*, 539 U.S. 113, 122, 123 S. Ct. 2191, 2198, 156 L. Ed. 2d 148, 159 (2003) (alteration in original) (quoting *N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 14, 108 S. Ct. 2225, 2234, 101 L. Ed. 2d 1, 17 (1988)). When a statute's infringement on speech protected under the First Amendment is marginal, a finding of facial invalidity is inappropriate if the "remainder of the statute . . . covers a whole range of easily identifiable and constitutionally proscribable . . . conduct." *Ferber*, 458 U.S. at 770 n.25, 102 S. Ct. at 3362 n.25, 73 L. Ed. 2d at 1131 n.25 (alterations in original) (quoting *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 580-81, 93 S. Ct. 2880, 2898, 37 L. Ed. 2d 796, 817 (1973)).

In an overbreadth analysis, the reviewing court must "construe the challenged statute." *United States v. Williams*, 553 U.S. 285, 293, 128 S. Ct. 1830, 1838, 170 L. Ed. 2d 650, 662 (2008). As detailed above in our analysis of the facial constitutionality

of the statute, we see that the statute is drafted carefully to limit its reach by establishing four specific criteria that must be met before access to a commercial social networking Web site is prohibited to a registered sex offender, N.C.G.S. § 14-202.5(b); that the statute exempts sites that are exclusively devoted to speech, *id.* § 14-202.5(c); and that the statute requires the State to prove that a registered sex offender knew the site permitted minor children to become members or to create or maintain personal Web pages on the commercial social networking Web site, *id.* § 14-202.5(a). These factors ensure that registered sex offenders are prohibited from accessing only those Web sites where they could actually gather information about minors to target. Outside these limits, registered sex offenders are free to use the Internet.

Although this statute "may deter protected speech to some unknown extent," *Broadrick*, 413 U.S. at 615, 93 S. Ct. at 2917, 37 L. Ed. 2d at 842, that effect can be characterized "at best [as] a prediction," *id.*, 93 S. Ct. at 2917-18, 37 L. Ed. 2d at 842, and we "cannot, with confidence, justify invalidating [this] statute on its face," *id.*, 93 S. Ct. at 2918, 37 L. Ed. 2d at 842, and prohibit the State from continuing to enforce a statute protecting such an important government interest, *id.* Given the reluctance with which courts administer the strong medicine of overbreadth, we conclude section 14-202.5 does not sweep too broadly in preventing registered sex offenders from accessing carefully delineated Web sites where vulnerable youthful users may congregate. As in *Broadrick*, "whatever overbreadth may exist should be cured

through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied." *Id.* at 615-16, 93 S. Ct. at 2918, 37 L. Ed. 2d at 842.

Finally, the State challenges the Court of Appeals holding that the statute is unconstitutionally vague. Laws that are not "clearly defined" are void for vagueness under the Due Process Clause. *See Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S. Ct. 2294, 2298, 33 L. Ed. 2d 222, 227 (1972). Laws must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited," *id.* at 108, 92 S. Ct. at 2298-99, 33 L. Ed. 2d at 227, and must also provide sufficient clarity to prevent arbitrary and discriminatory enforcement, *see Petersilie*, 334 N.C. at 182, 432 S.E.2d at 839; *see also Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 102 S. Ct. 1186, 71 L. Ed. 2d 362 (1982). Vague laws chill free speech because "[u]ncertain meanings inevitably lead citizens to 'steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked.' " *Grayned*, 408 U.S. at 109, 92 S. Ct. at 2299, 33 L. Ed. 2d at 228 (second alteration in original) (quoting *Baggett v. Bullitt*, 377 U.S. 360, 372, 84 S. Ct. 1316, 1323, 12 L. Ed. 2d 377, 385 (1964)).

Vagueness cannot be raised by a defendant whose conduct falls squarely within the scope of the statute. *See Parker v. Levy*, 417 U.S. 733, 756, 94 S. Ct. 2547, 2562, 41 L. Ed. 2d 439, 458 (1974) ("One to whose conduct a statute clearly applies may not successfully challenge it for vagueness."); *see also Hoffman Estates*, 455 U.S. at 495, 102 S. Ct. at 1191, 71 L. Ed. 2d at 369 ("A plaintiff who engages in some conduct that

is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others."). The Court of Appeals "assume[d] that persons of ordinary intelligence would likely interpret the statute as prohibiting access to mainstream commercial social networking sites such as *Facebook.com*." *Packingham*, ___ N.C. App. at ___, 748 S.E.2d at 153. Whatever the status of other Web sites, no party disputes that Facebook.com, the site at issue here, falls under N.C.G.S. § 14-202.5's definition of "commercial social networking Web site." While an argument may be made that the statutory term "access" could be vague in other contexts, defendant's logging into his Facebook account and posting a message on his page is unquestionably "accessing" Facebook.com. Defendant's conduct defeats his vagueness claim.

Accordingly, we reverse the opinion of the Court of Appeals.

REVERSED.

Justice ERVIN did not participate in the consideration or decision of this case.

Justice HUDSON dissenting.

The majority concludes that N.C.G.S. § 14-202.5 (2013), which bars any registered sex offender from accessing any commercial social networking site on which he knows a minor can create or maintain a profile, is constitutional on its face and as applied to defendant. Because I conclude that the statute is unconstitutional on its face, I disagree with the majority's reversal of the Court of Appeals. More specifically, I conclude that section 14-202.5 is not narrowly tailored enough to withstand even intermediate scrutiny and that it is facially overbroad under the First Amendment. Accordingly, I respectfully dissent.

As an initial matter, I agree with the majority opinion to the extent it concludes that N.C.G.S. § 14-202.5, by proscribing access to commercial social networking sites, targets sites which are used for "gathering information and [as] means of communication." However, I do not agree with the later assertion that the statute primarily regulates conduct and places only an "incidental" burden on speech. This statute completely bars registered sex offenders from communicating with others through many widely utilized commercial networking sites. Therefore, in my view, it primarily targets expressive activity usually protected by the First Amendment. *See, e.g.*, *Reno v. ACLU*, 521 U.S. 844, 870, 117 S. Ct. 2329, 2344 (1997) (observing that previous cases from that Court "provide no basis for qualifying the level of First Amendment scrutiny that should be applied" to online activities); *see also Brown v.*

*Entm't Merchs. Ass'n*, ___ U.S. ___, ___, 131 S. Ct. 2729, 2733 (2011) ("And whatever the challenges of applying the Constitution to ever-advancing technology, the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary when a new and different medium for communication appears." (citation and internal quotation marks omitted)).

The majority finds the "four-factor test from [*United States v. O'Brien*, 391 U.S. 367, 88 S. Ct. 1673 (1968)] instructive" in applying intermediate scrutiny to what it sees as an "incidental" burden on speech. *O'Brien* involved a regulatory ban on burning of a draft card, which the Court saw as conduct having a "communicative element." *Id.* at 376, 88 S. Ct. at 1678. Because I read *O'Brien* to apply only where the restriction primarily targets expressive conduct, and because the statute at issue here necessarily burdens speech directly, I would not apply *O'Brien*'s four-factor test here. *See id.*, 88 S. Ct. at 1678-79 ("This Court has held that when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms."). Instead, I would analyze this statute as one that, by design and in effect, primarily and directly regulates First Amendment-protected activity, not conduct.

Because this statute primarily regulates speech (and other protected activity), I would apply the scrutiny applicable to restrictions on speech. *See, e.g.*, *McCullen v. Coakley*, ___ U.S. ___, ___, 134 S. Ct. 2518, 2530 (2014); *Holder v. Humanitarian Law*

*Project*, 561 U.S. 1, 26-28, 130 S. Ct. 2705, 2723-24 (2010). According to these cases, the next step would be to determine whether the statute is content-based or content-neutral. Content-based restrictions are "presumptively unconstitutional" and can stand only if they survive strict scrutiny, the most difficult test in federal constitutional law. *McCullen*, ___ at ___, 134 S. Ct. 2530. In contrast, content-neutral measures that burden speech are subject to a form of intermediate scrutiny—a still difficult but less exacting analysis. *See id.* at ___, 134 S. Ct. 2530.

Here, applying the United States Supreme Court's recent decision in *Reed v. Town of Gilbert*, ___ U.S. ___, 135 S. Ct. 2218 (2015), the majority concludes that N.C.G.S. § 14-202.5 is a content-neutral burden on conduct only incidentally affecting speech. While I think there is a strong argument in light of *Reed* that the statute is content-based because it prohibits registered sex offenders from accessing some websites, but not others, based on the content that appears on the sites, I do not think we need to resolve this question because I conclude that the law cannot withstand even intermediate scrutiny.

The intermediate scrutiny standard applicable to content-neutral regulations on speech requires the government to demonstrate, *inter alia*, that the restriction is "narrowly tailored to serve a significant governmental interest." *McCullen*, ___ U.S. at ___, 134 S. Ct. at 2534 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 796, 109 S. Ct. 2756, 2746 (1989)). More specifically,

> [f]or a content-neutral time, place, or manner

> regulation to be narrowly tailored, it must not burden substantially more speech than is necessary to further the government's legitimate [and significant] interests. Such a regulation, unlike a content-based restriction of speech, need not be the least restrictive or least intrusive means of serving the government's interests. But the government still may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.

*Id.* at ___, 134 S. Ct. at 2535 (citations and internal quotation marks omitted). In short, when a statute "burden[s] substantially more speech than necessary to achieve the [government's] asserted interests," it will fail this form of intermediate scrutiny. *Id.* at ___, 134 S. Ct. at 2537. Here, there is no dispute that the State's purported concern—protecting minors from exploitation by registered sex offenders using the Internet—qualifies as a legitimate and significant government interest. The central question, then, is whether section 14-202.5 "burden[s] substantially more speech than necessary" in support of that interest. *Id.* at ___, 134 S. Ct. at 2537.

I conclude that it does. First, the statute as written sweeps too broadly regarding who is subject to its prohibitions. As noted, the State's interest here is in protecting minors from registered sex offenders using the Internet. However, this statute applies to *all* registered offenders. *See* § 14-202.5(a) ("It is unlawful for a [registered] sex offender . . . to access a commercial social networking Web site where the sex offender knows that the site permits minor children to become members or to create or maintain personal Web pages on the commercial social networking Web site."). The statute is not restricted in application only to those whose offenses

harmed a minor or in some way involved a computer or the Internet, nor to those who have been shown to be particularly violent, dangerous, or likely to reoffend. This statute therefore groups together, without distinction, offenders whose history and past conduct directly implicate the State's concerns with those who do not. To the extent the statute does so, it "burden[s] . . . more speech than necessary to achieve the [State's] interests." *McCullen*, ___ U.S. at ___, 134 S. Ct. at 2537.

Second, as written, the statute also sweeps far too broadly regarding the activity it prohibits. The majority asserts that the statute prohibits "registered sex offenders from accessing only those Web sites that allow them the opportunity to gather information about minors." But in fact, the statute contains no such limitation. Section 14-202.5 defines the term "commercial social networking Web site" as a website that (1) is operated by someone who derives revenue from the site; (2) facilitates "social introduction" or "information exchanges" between two or more people; (3) allows users "to create Web pages or personal profiles that contain information such as the name or nickname of the user, photographs placed on the personal Web page by the user, [or] other personal information about the user . . . that may be accessed by other users or visitors" to the site; and (4) provides "users or visitors mechanisms to communicate with other users." N.C.G.S. § 14-202.5(b). I note in particular that the statute's description of a "personal profile[ ]," and the language "such as" when referring to the information that can appear in such profiles, could bring within the statute's scope many websites that allow users to register by

going through the minimal process of creating a username and adding an email address or telephone number. As a result, this definition clearly includes sites that are normally thought of as "social networking" sites, like Facebook, Google+, LinkedIn, Instagram, Reddit, and MySpace. However, the statute also likely includes sites like Foodnetwork.com, and even news sites like the websites for *The New York Times* and North Carolina's own *News & Observer. See The News & Observer Terms of Service*, http://www.newsobserver.com/customer-service/terms-of-service/ (last visited Oct. 22, 2015) (stating that "[i]f you are under eighteen (18) then you may only use NewsObserver.com with the consent of a parent or legal guardian" but not limiting registration on the site to adults). Most strikingly, the statute may even bar all registered offenders from visiting the sites of Internet giants like Amazon[2] and Google.

In short, however legitimate—even compelling—the State's interest in protecting children might be, the plausible sweep of the statute as currently written "create[s] a criminal prohibition of alarming breadth," *United States v. Stevens*, 559 U.S. 460, 474, 130 S. Ct. 1577, 1588 (2010), and extends well beyond the evils the State seeks to combat. I therefore conclude that N.C.G.S. § 14-202.5 "burden[s]

---

[2] The statute does except from this definition any website that "[h]as as its primary purpose the facilitation of commercial transactions involving goods or services *between its members or visitors*." N.C.G.S. § 14-202.5(c)(2) (emphasis added). However, as defendant argues, "Amazon's primary purpose is to facilitate transactions *between Amazon itself and its visitors*, not between users of the Web site and other users." (Emphasis added.) Accordingly, it appears that this exception does not actually apply to websites like Amazon, but only covers websites like Craigslist or eBay.

substantially more speech than necessary to achieve the [State's legitimate] interests," *McCullen*, ___ U.S. at ___, 134 S. Ct. at 2537, and cannot survive even the intermediate scrutiny applied to content-neutral restrictions on speech.

In addition, for similar reasons, I conclude that this statute is also facially overbroad under the First Amendment. The overbreadth inquiry is very similar to the "narrow-tailoring" inquiry described above: First Amendment overbreadth doctrine requires a court to invalidate a statute that "prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292, 128 S. Ct. 1830, 1838 (2008). There is, however, one important nuance. Namely, while the Supreme Court of the United States has often invalidated specific applications of statutes under as-applied challenges, *see, e.g.*, *McCullen*, ___ U.S. at ___, 134 S. Ct. at 2528, 2541, that Court has also made clear that First Amendment doctrine specifically permits litigants to make facial challenges based on overbreadth, *see, e.g.*, *Stevens*, 559 U.S. at 473, 130 S. Ct. at 1587 ("In the First Amendment context, however, this Court recognizes a second type of *facial* challenge, whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." (emphasis added) (citation and internal quotation marks omitted)); *Williams*, 553 U.S. at 292, 128 S. Ct. at 1838 ("According to our First Amendment overbreadth doctrine, a statute is *facially invalid* if it prohibits a substantial amount of protected speech."(emphasis added)). The Court has even noted that such a challenge is permitted when the challenger's

own conduct would clearly fall within the scope of the statute's prohibition and the claim is based only on how that statute might apply to the activity of others. *See, e.g.*, *Humanitarian Law Project*, 561 U.S. at 20, 130 S. Ct. at 2719 ("[A] plaintiff whose speech is clearly proscribed cannot raise a successful vagueness claim under the Due Process Clause of the Fifth Amendment for lack of notice. And he certainly cannot do so based on the speech of others. [But s]uch a plaintiff may have a valid overbreadth claim under the First Amendment . . . ."). In light of this precedent permitting such challenges, and for the reasons noted above, I would hold that the statute at issue here, N.C.G.S. § 14-202.5, is facially overbroad and therefore unconstitutional, regardless of its application in this specific case.

For the foregoing reasons, I conclude that N.C.G.S. § 14-202.5 is both insufficiently narrowly tailored to satisfy intermediate scrutiny and facially overbroad under the First Amendment. Because I disagree with the majority's conclusions to the contrary, I respectfully dissent.

Justice BEASLEY joins in this opinion.